# CASES

## ARGUED AND DETERMINED

### IN

# THE SUPREME COURT

#### OF

## THE STATE OF MISSOURI,

### OCTOBER TERM, 1867, AT ST. LOUIS.

----

### THE MURPHY AND GLOVER TEST OATH CASES.

*Constitution — Test Oaths—Clergymen — Attorneys — Bills of Attainder — Ex post facto Laws.* — The Supreme Court of the United States having decided, in the case of Cummings, 4 Wall. 277, that the *oath of loyalty* prescribed by the Constitution of this State, art. 2, §§ 3, 6, 7, 9 & 14, in reference to clergymen, and, so far as relating to past acts, to be a bill of pains and penalties within the prohibition of the Constitution of the United States, and therefore unconstitutional and void, the court accepts the authority of that decision as establishing the rule in similar cases. The decision in the case of Ex parte Garland, 4 Wall. 333, applies the same rule to the case of attorneys.

Per HOLMES, J. The persons affected by the test oath were entitled to the benefit of the legal presumption of innocence, in conformity with the great principles of public law which constitute the law of nations, as recognized by the Constitution of the United States. Those who were citizens, and became rebels and criminals in law, are by the amnesty proclaimed restored to their former estate and condition of citizenship, and must thenceforth be presumed innocent until convicted of some new crime; and are entitled to the common benefit of the laws and government, and to nothing more: they owe obedience to the laws, and are entitled to the protection of the law. For their opinions and feelings, when not put forth in any new acts

of resistance, they are not responsible to the civil state. The right of trial by jury, and the presumption of innocence involved therein, is protected by the Federal Constitution, and cannot be infringed by a State. Natural rights become civil rights when defined, declared and secured by the laws of the civil state, and when properly secured they constitute civil liberty. The rights of life, liberty and property (that is, personal security, personal locomotion or freedom from arrest, and private property), when they exist, are protected by the Federal Bill of Rights from being taken away in any criminal case without due process of law. The courts must determine the question, whether a legislative enactment is in its effect and intention a legislative sentence of punishment, and the intention must be discovered from a true construction of the law and from the effects produced by it. The effects produced must be presumed to have been within the intention of the legislative body enacting the law. The exclusions and disabilities of the oath of loyalty refer directly to the enumerated acts, and it is assumed that these persons have done some one or more of the acts, of which some are manifestly crimes, and all are dealt with in the same way as if they were of like nature ; the truth of which they are obliged to confess by the impossibility of their taking the oath, thus effectually changing the rules of evidence and subverting the presumption of innocence retrospectively in every individual case, contrary to the law of nations and the national right of trial by jury in criminal cases. It must be assumed that the legislative body intended to do what is actually done, and that would seem to be, essentially, nothing else than a legislative sentence of punishment for past conduct as criminal ; and so it may be concluded that the act itself assumes judicial magistracy, weighs the offence and the proofs, decides upon the necessity and fitness of the penal judgment, assumes the guilt, ascertains the persons, and declares the punishment.

THE STATE OF MISSOURI, Respondent, *v.* DAVID H. MURPHY, Appellant.

Same *v.* PATRICK A. RYAN.

Same *v.* BENJAMIN F. MILES.

*Appeals from Cape Girardeau Circuit Court.*

*Davis & English*, for appellants.
*Mc Williams*, for respondent.

THE STATE OF MISSOURI *v.* ASHAEL MUNRO.

*Appeal from Cape Girardeau Circuit Court.*

*Dryden & Lindley*, for appellant.

THE STATE OF MISSOURI *v.* HENRY STROMBERGER.

Same *v.* same.

*Appeal from Scott Circuit Court.*

*English & Green,* for appellant.

*McWilliams,* for respondent.

THE STATE OF MISSOURI *v.* SAMUEL T. GLOVER.

*Appeal from St. Louis Criminal Court.*

\* *Whittelsey,* for appellant Glover.

The defendant was indicted and found guilty of having practised as an attorney-at-law, after the adoption of the new Constitution, without first having taken and filed the oath of loyalty prescribed by secs. 9, 6, 3 and 14 of art. 2 of that instrument.

It was admitted upon the trial that the defendant had been regularly admitted and licensed to practise law in all the courts of this State, by virtue of the laws in force, sixteen years ago, and that he had since continued to practise in the courts up to the time of the finding of this indictment, and that he had not taken the oath of loyalty as required by sec. 9, art. 2, within sixty days after the Constitution went into effect.

The defendant prayed the St. Louis Criminal Court, upon the facts admitted, to declare several propositions of law, which were refused, and, a motion for new trial being overruled, the case is brought up by appeal.

Before presenting the propositions of law and commenting thereupon, let us first know the true position of the parties, so as to learn what principles may be applicable to the facts. The defendant has been a citizen of and residing in this State for sixteen years, and was duly licensed to practise, and was enrolled upon the records and practised in the courts. His case, therefore, must be judged by different rules, and, in part, upon different principles, from that of one for the first

---

\* The importance of the principles involved in these cases, and the extended history of the law of "Attainder," and of Bills of Attainder and Test Oaths, presented by the counsel in the Glover case, induces the reporter to publish the argument at length.

time applying for admission to the bar. The defendant claims his right to practise law, no matter what the extent of that right may be, from the Constitution and laws in force at the time he was permitted to practise. We consider the right thus given as a franchise, which belonged to him for life, and which could not be taken away except as a punishment for some offence committed, some law violated. The particular character of this right or franchise we defer to a subsequent part of our argument; it is sufficient for our present purpose that the provisions of the new Constitution, art. 2, secs. 3, 6, 9 and 14, do act upon and affect antecedent rights, privileges, or franchises ; that a right which the defendant enjoyed before the new Constitution was formed, is taken away sixty days after that instrument goes into effect. It is taken away from him without alleging and proving that he has committed any crime, or violated any law ; his licence is taken away peremptorily, without cause assigned, and he may procure a new licence upon taking and filing the oath prescribed. The old right is forfeited, and a new right must be obtained.

The first proposition which I present is—That the provisions of the new Constitution, art. 1, secs. 3, 6, 9 and 14, so far as they apply to attorneys previously citizens of the State of Missouri, and under its former laws duly licensed and admitted to the practice of law, are in violation of the Constitution of the United States, for the reason that they are in the nature of a bill of attainder, or a bill of pains and penalties, and therefore null and void.

We must therefore consider the nature and character of bills of attainder, which really include bills of pains and penalties. I find upon examination that it will not do to rely simply upon the definitions of the later text writers, writing upon a subject which at the time possessed no particular interest.

" Bills of attainder are said to be (2 Sto. Const. § 1344) such acts of the Legislature as impose capital punishment upon persons supposed to be guilty of high crimes and offences, such as treason and felony, without any conviction in the ordinary course of judicial proceedings. If they impose a milder punishment than death, they are called bills of pains and penalties. Bills of attainder may include bills of pains and penalties, they may affect the life of an individual or his property, or both," and, I add, they may affect his person, and not his life ; his personal, civil, or political rights, and

not his property. I define a "bill of attainder," in its most general sense, as a legislative enactment by which the legislative power affixes upon any individual by name, or upon any class of persons by description, any pain, penalty, punishment, or stain, either as a consequence of some past acts by them done, or not done, or from the mere will of the sovereign power.

In my argument in the case of Cummings, which was prepared hastily, I took the simple statements of Blackstone as giving the whole history and law of attainder; but examinations of the history of attaints, judicially and by legislative enactments, have convinced me that I was too hasty in taking up an opinion, and that the thing forbidden by excluding "bills of attainder" was more comprehensive than I had supposed. Upon an argument addressed to a court, I must not give a historical essay; but every good lawyer knows that you can never determine what a law really is until you have learned where and how it emanated—what where the feelings, beliefs and wants of society which gave it being—and how it has been gradually elaborated and made to serve the purposes of society, or of those who controlled the government.

Attainting was the attaching to the person a stigma, from which by law certain consequences, more or less extensive, were made to follow. The principal consequence was forfeiture of lands and tenements, goods and chattels, as in cases of felony; to which was added, in some cases, corruption of blood—4 Black. Com. 94, definition of Felony.

As felonies and crimes punishable by forfeiture were generally, in the early English law, also punishable with death, some writers have spoken of attainder as if death was always a part of the penalty or consequence of the attainder, which is a mistake, as we shall show. "Attainted," in the old English statutes, is generally used as equivalent to the words "adjudged to the penalties of" the crime named; sometimes it is synonymous with the common use of the word "convicted," as implying not only the verdict of guilty, but the judgment upon such verdict. I shall give instances of the various uses of the word to prove the correctness of my definition.

Blackstone says "attainder" was the consequence of the judgment which condemned the criminal for a capital offence—4 Blk. Com. 381. It would have been more correct to say that "attainder" was the judgment itself, and that its

consequences are forfeiture, &c., of lands, goods and personal rights, and corruption of blood.

Death was not always the consequence of an attainder. For instance, a party attainted of a *præmunire* did not forfeit his life; death was not the penalty attached to a judgment in such cases. By stat. 16, Rich. II., ch. 1, the penalty ordained in cases of *præmunire* was, that the offenders were to be out of the King's protection, to forfeit their lands and goods, to be imprisoned and detained at the King's pleasure: and if the offenders were not found they were to be outlawed.

"Attainder of *præmunire*" is a common term used in the old English law books and statutes. In Lord Vaux's case, 1 Bulst. 197, he was adjudged to be out of the King's protection, to forfeit lands, tenements, goods and chattels to the King, and to be imprisoned during life. In Grosse v. Gayer, Cro. Car. 193, 172, Tregosse was indicted for a *præmunire*, attainted by verdict, and the question was, did the attainder in a *præmunire* have relation back to the time of the offence, or only to the time of the judgment?

There was an "attainder by abjuration," by abjuring the realm, and also an "attainder by outlawry." Attainder was distinct from forfeiture, for the corruption may be saved and the forfeiture remain.—See Jac. Law Dic., Outlawry, *Præmunire*, Abjuration.

By act 27 Eliz., ch. 2, directed against Jesuits and priests of the Church of Rome, priests coming into the realm, except in special cases, were to be adjudged guilty of high treason. By sec. 5 of the act, every person receiving such were declared guilty of felony, to suffer death, and lose and forfeit as in cases of one attainted of felony.

By the act of 5 Eliz., ch. 1, also directed against the Catholics, it was enacted "that every person who by writing, printing, teaching, preaching, or by deed or act setting forth and maintaining the jurisdiction and power of the bishop of Rome, &c., their aiders and abettors, should incur the penalty of *præmunire* prescribed by statute of 16 Rich. II. By sec. 5, all officers in the kingdom of every description, all officers in the church, all persons admitted to degrees in the universities, all schoolmasters, and public and private teachers of children, were to take the oath of abjuration and allegiance prescribed by Stat. 1 Eliz., ch. 1, § 19; and by sec. 8 it was provided that all persons refusing to take such oaths, and convicted or attainted at any time thereafter, should suffer

the penalties of *præmunire;* and by sec. 10, for refusing to take such oath when tendered the second time, they were to suffer the penalties of treason. Sec. 21 of the same act provided that it should not be lawful to kill any one " attainted of a *præmunire*." Section 23 uses the word "attainted" as equivalent to "to be convicted."

The act 3 of Jas. I., ch. 4, also directed against the Catholics, and similar to that of Elizabeth, and providing similar penalties, made attempts at conversion to the see of Rome high treason ; but sec. 28 provided that attainder of felony under the act should not work corruption of blood, nor disinherit the heirs of the persons attainted.

As generally the Parliament of England, especially in former times, declared in accordance with their terrible criminal code, every offender at whom they struck by special statute guilty of high treason, we have generally thought that the penalty or consequence of every attainder was death, forfeiture, and corruption of blood. We have seen that all these consequences did not follow every attainder at law when declared as the judgment of a judicial tribunal. Against the omnipotent power of kings, lords, and commons, there was no appeal. The attainders of one reign might be reversed in the next, or even in the course of a few short years by the same power that affixed them.

With permission of the court, I will refer to some of the English acts of attainder, that we may learn what are the characteristics of such acts, their peculiar qualities, which induced the framers of our Constitution to prohibit all such legislation, not only to the States but also to the United States.

In the early history of civilization, when the state first began to punish crimes as injuries done to the state rather than to the individual or family, crimes were punished by special legislative acts, directed against the particular act and person, and not by judicial process under a general law applying to all acts of a similar character—Maine's Anc. L. —). It was acting upon past conduct, not prescribing a rule for future conduct.

The act of attainder of 11 Rich. II., ch. 1, directed against the Archbishop of York, Earl of Suffolk, and others, and their adherents, speaks of the parties named as having been attainted by Parliament upon trial, upon the appeal of the Duke of Gloucester, and declared that none of the traitors attainted by the appeal aforesaid should receive pardon. It

attainted some after they were dead, in which case the penalty could only be forfeiture and corruption of blood. By 20 Rich. II., ch. 6, some of the persons thus attainted when out of the realm were licensed to return. The act of 11 Ric. II., ch. 3, forfeited the castles, lands, estates, &c., of the Bishop of Chichester and other named parties. Act 28 Hen. VIII., ch. 12, attainted Eliz. Burton et als. for slandering the divorce of Henry from Catherine of Arragon, and his marriage with Anne Boleyn. The act is not given at length in the Statutes at Large, but merely the title. The act 33 Hen. VIII., ch. 20, § 2, uses the words "attainted of high treason" as equivalent "to be adjudged to suffer the penalties of high treason," and declares that attainder by due course of the common law or statutes of the realm shall be as good as if by act of Parliament. Act 33, Hen. VIII., ch. 20, attainted Queen Catherine Howard of high treason for her incontinence, and forfeited the property of herself and her accomplices to the King. Title only found in the Stat. at Large. Act 3, Ed. VI., ch. 17, confirmed the attainder of Wm. Sherrington, who was "indicted and attainted by confession of high treason" for counterfeiting the coin. He was pardoned and restored by 3 & 4 Ed. VI., ch. 13. Acts 2 & 3 Ed. VI., ch. 18, attainted Lord Seymour of high treason, but provided for paying his debts. 9 Hen. VI., ch. 3, confirmed the attainder of Owen Glendower. 1 Mary St. II., ch. 16, confirmed the attainder of the Duke of Northumberland, Archbishop Cranmer, et al. 13 Eliz., ch. 16, confirmed the convictions, outlawries and attainders of the Earl of Westmoreland, and fifty-seven others, attainted of treason for rebellion. 29 Eliz., ch. 1, confirmed attainders of Lord Paget et als., and provided that there should be no reversal of attainder by the heirs after execution. 35 Eliz., ch. 5, confirmed attainder of Sir Francis Englefield, who went forth of the realm by licence, but was attainted. 3 Jas. I., ch. 2, confirmed attainder of the conspirators in the Gunpowder Plot. It speaks of one as "indicted, convicted and attainted by his own confession"; of another, as "indicted, arraigned, convicted by verdict, and thereupon attainted." It attaints Catesby and four others who had been slain in open rebellion, and Tresham, who had died in the Tower before judgment.

From these acts—33 Hen. VIII., ch. 20; 3 Ed. VI., ch. 17; 9 Hen. VI., ch. 3; 1 Mar. St. II., ch. 16; 13 Eliz., ch. 15; 29 Eliz., ch. 1; 35 Eliz., ch. 5; 3 Jas. I., ch. 2—it would

seem as if in those days it had been a mooted question, whether there could be an attainder for high treason except by a special act of Parliament. Notice the confirmation of judicial attainders in the different acts, and the express provision of 33 Hen. VIII., ch. 20, declaring that judicial attainders, attainders by due course of the common law, or under the provisions of the statutes, should have the same effect as attainder by act of Parliament.

Thomas Cromwell, Earl of Essex, 32 Hen. VIII., ch. 60 (to be found in the appendix to Burnet's Reformation, App. 16, bk. 3, vol. 4, N. Y. ed., p. 105), was attainted for heresies and treasons: "Shall be and stand, by authority of this present Parliament, convicted and attainted of heresie and high treason, and be adjudged an abominable and detestable heretick and traitor, and shall have and suffer such pains of death, losses and forfeitures of goods, debts and chattels, as in cases of heresie and high treason, or as in cases of either of them, at the pleasure of your most Royal Majesty, and shall lose and forfeit all his lordships, manors, lands," &c.

Strafford's attainder, 16 Car. I., ch. 38 (to be found in 1 Rushworth, 756), has this curious proviso: "That it shall not be taken for a precedent in like cases." It struck at the liberties of the citizen, whom, with all their ingenuity, they had failed to convict of the crimes the Commons had alleged against him in their impeachment before the Lords. The history of those days is repeating itself in our own times, and the detailed history of the Great Rebellion, as it shows itself in the pages of Rushworth, and in the original documents of the time, is full of instruction for us. The ordinance for the attainder of the Archbishop of Canterbury will be found in 5 Rushw. 785. Ordinances for requiring oaths approving the King's death ; for seizing and sequestrating the estates, real and personal, of the bishop named, and of the bishops, deans, chapters, and of all persons, ecclesiastical or temporal, who had adhered to the King ; ordinances for assessing malignants' estates ; requiring oaths to support and maintain the Solemn League and Covenant—read by the light of the statutes of Charles II. and the history of his reign—give us some means of judging of the course of revolutions. After Cromwell's *coup d'état*, he proclaimed a constitution for the government of England, Scotland, and Ireland, on the 16th December, 1653, making himself Lord Protector, and vesting in himself all legislative and executive powers.—See 6 Somers' Tracts, 284. The constitution endured during Crom-

well's life, but in 1660 the act of 12 Car. II., ch. 30, attainted of high treason Cromwell, Ireton, Bradshaw, and Pride, after their deaths, as if they were living, and attainted those regicides who had fled the realm, and those under arrest, and declared that " they and every one of them stand and be adjudged, and by authority of this present act convicted and attainted of high treason"; and that all their lands, goods, chattels, &c., should be forfeited, &c. As Jack Cade had nothing to forfeit, and had been killed in the insurrection, the act of 31 Hen. VI., ch. 1, attainting him, seems to have been designed to affix upon him the stigma of a traitor, and declares that "the said Jack Cade shall be reputed, had, named and declared a false traitor," &c., and that his acts, orders, &c., shall be void and be put out of remembrance forever, &c.

I desire to call the attention of the court to other acts of attainder in the English statutes before I draw the conclusions from them which I think they warrant. The founders of our Constitution were familiar with English history, and their own experience during the war of the Revolution had taught the serious lesson that the passions of war needed every restraint that could be placed upon them, and that war was not the school of freedom.

An act for disabling and banishing the Earl of Clarendon was passed 19 Car. II., ch. 10.* The acts 13 and 14 of Wm. III., ch. 3, for attainting the pretended Prince of Wales, use nearly the same terms with the statutes I have cited. Bolingbroke, who had fled to France, was declared attainted by act (1 Geo. I., st. 2, ch. 16), unless he surrendered himself for trial as a traitor, and adjudged to suffer as a person attainted of high treason ought to forfeit and suffer. See also attainder of Duke of Ormond, 1 Geo. I., st, 2. ch. 17, and attainder of Alexander, Earl of Kellie, 19 Geo. II., ch. 36.

I refer also to acts inflicting pains and penalties :—1 Geo. I., ch. 17, George Kelly alias Johnson ; he was to be imprisoned during pleasure, and to forfeit all his lands, goods, chattels, &c. 1 Geo. I., ch. 17, to inflict pains and penalties on Francis, Bishop of Rochester ; he was banished into perpetual exile ; if he returned he was to suffer as a felon, and all who harbored and concealed him were declared guilty of felony ; and all who held correspondence with him by letters, messages or otherwise, directly or indirectly, were also de-

---

* Given at length, *ante* p. 87.

clared guilty of felony.† See also act 11 Geo. III., ch. 55, to incapacitate Jno. Burnett, and sixty-seven others named, from voting at elections for members of Parliament, &c.‡ Hallam in his Constitutional History, ch. 16, calls the act of 1 Geo. I., ch. 17, an attainder of Rochester. Pains and penalties inflicted upon Sir John Fenwick, 7 & 8 Wm. III., ch. 3. The act 8 Wm. III., ch. 5, required Sir Geo. Barclay et als. to surrender or be attainted. Pains, penalties and forfeitures of certain regicides, 13 Car. I., st. 1, ch. 15. Reversal of Stafford's attainder, 13 & 14 Car. II., ch. 29. Attainder of Thomas Dolman et als. for not rendering themselves, 17 Car. II., ch. 5. Attainder of Sir George Barclay et als. not rendering themselves, 8 Wm. III., ch. 5, and for keeping Counter et als., and those who may be arrested, in custody without bail. Imprisonment of Counter et als. continued, 9 Wm. III., ch. 4; 10 & 11 Wm. III., ch. 13, & 1 Anne, ch. 29. Of the Earl of Kellie et als. unless they surrender, 19 Geo. III., ch. 26. Act to inflict pains, &c., on John Plunket, 15 Stat. at Large, p. 65.§ Nearly all these bills of attainder or pains and penalties (when the offenders had escaped or were in prison) declared that all persons aiding the offenders, or corresponding with them, should be guilty of felony and suffer death, and forfeit as in case of felony.

Let us inquire what are the qualities common to all these different statutes we have cited:

1. They all inflicted forfeiture of rights; they did not always produce corruption of blood.

2. They were all statutes contrary to the course of the common law, made to serve a special purpose, acting upon the past acts of individuals, and were not rules for the future conduct of the community generally; although in some cases prescribing a rule for some few persons who might be connected with named offenders, as their aiders and abettors and accomplices.

3. In some cases they allowed parties to surrender and take their trials, and punished them if they failed to come forward and stand trial.

The particular character, then, which marks all bills of attainder, which includes bills of pains and penalties, is this: that they are intended to serve a particular purpose, and to inflict some pain, penalty, punishment, or stigma, upon the individuals by name, or by description as a class, in conse-

† *Ante* p. 88.            ‡ *Ante* p. 93.            § *Ante* p. 91.

quence of some previous acts by them done or omitted to be done. In all cases cited there was a forfeiture of rights, liberties, and franchises.

The distinction between a statute of attainder and an *ex post facto* law appears to be this: an *ex post facto* statute is a general law; a statute of attainder is a special law. From this induction, I proceed to inquire whether the provisions of the Constitution, art. 3, §§ 3, 6, 9 & 14, so far as they apply to an attorney duly licensed and admitted to practise in the courts of the State prior to the adoption of the Constitution, do inflict any pain, or penalty, or punishment. The defendant was a citizen of this State, duly licensed and admitted to practise as an attorney and counsellor at law in all the courts of this State prior to the adoption of the Constitution. That fact is admitted of record. I affirm that such licence was a franchise belonging to him ; that it was a franchise for life, and that he only could be deprived of it as a consequence of some violation of a law that was to regulate not his past but his future conduct. If he be deprived of this franchise on account of some act done before the law was enacted, the law would be an *ex post facto* law, or an attainder.

In the case of the attorney's oath, 20 Johns. 492, Platt, J., said : " In my opinion, an attorney or counsellor does not hold an office, but exercises a franchise or privilege : they are not public officers." This was said upon the question, whether attorneys applying to be admitted to the bar should be required to take the oath prescribed by the act of 1816, that they had not been engaged in a duel, the new Constitution having provided the oath to be taken by public officers.

Blackstone (2 Com. 37) defines a franchise or liberty as "a royal privilege, or branch of the King's prerogative, subsisting at the hands of a subject"; that they must be held from a grant or prescription. He cites a large number of franchises, such as manors, lordships, franchise of wrecks, &c. ; of fisheries, forfeitures, deodands, franchises of corporations, &c., &c., in all of which the subject has an estate.

The State has seen fit, for its own purposes, to restrict the practice of the law to a particular class of persons, who have proved their possessing the necessary qualifications. It is not thrown open to every man in the community ; it therefore becomes a franchise, or liberty, granted by the State to individuals, upon sufficient considerations, and, being once granted, it cannot be taken away, except as a penalty for

some offence.   The State does not possess absolute power; it is forbidden the doing of certain things by the great Sovereignty of the Nation.   It cannot declare a forfeiture of the franchises it has granted, except in pursuance of some law providing such forfeiture as a penalty for the future violation of that law.   It cannot, directly or indirectly, declare such forfeiture as a consequence of some past act.

The defendant had his licence in accordance with the laws of the State ; that licence granted him a franchise, a liberty for his life, or during his good behavior.   How can the State take that right away ?   I am aware that courts have spoken of the right of the State to regulate trades and professions, but we must consider the facts of the cases upon which the courts were reasoning.

The question in the case of Simmons v. State, 12 Mo. 268, was upon the power to tax the profession of an attorney, not whether they could not take away his licence for no cause whatever.   They could not, under the guise of taxation, destroy his privilege without a violation of the Constitution.

The case of Austin v. State, 10 Mo. 591, was the case of one applying for a licence as an auctioneer, not that of one already possessing a licence.   But suppose Austin had paid the tax and received a licence, he possessing the qualifications presented by the statute, could the State take away that licence before the time limited had expired?   The law had created the franchise, granted it, and it could not legally destroy or revoke its grants.   Suppose it had granted a licence to an auctioneer for life in consideration of the payment of a tax of one thousand dollars, could it by any change of the law destroy or revoke the licence already granted?   Would not the grant of such a franchise be as good as a grant of a tract of land ?   It is well settled that the Legislature cannot revoke a grant of land or of a franchise.   The decisions upon that point are numerous—Fletcher v. Peck, 6 Cranch, 87, and New Jersey v. Wilson, 7 id. 164, which was the case of the grant of the franchise of the exemption of lands from taxes.   As to corporations, see Ang. & A. on Corp. § 671 and notes ; Pingrey v. Washburn, 1 Aik. 264.   But I need not cite the cases here.   I refer to them in connection with the points we have been discussing, the forfeiture of defendant's franchise or privilege of practising as an attorney.

The defendant has his licence—it is taken away from him, and that is a forfeiture of his privilege or licence.   How is it taken away and forfeited ?   By an enactment applicable

to the special case, a *pro re nata* law, not intended to be a permanent rule of action, as appears upon the face of the law itself. It matters not whether the law we are considering was enacted by the Legislature or a Convention of the people of the State, for we are testing the validity of the law by that supreme law, the Constitution of the United States, which binds every citizen to obedience in all parts of the land, from the rolling waters of those seas upon our northern borders to the sun-lighted waves of the Gulf of Mexico; from the stormy billows of the Atlantic to the gentle ripples of the far-reaching Pacific. The right is forfeited, taken away from the defendant, unless he will do something which he was not required to do by the law under which he received his licence.

This is not the case of a person applying for the first time for admission to practise, asking for a licence, for that would present an entirely different question; if one apply for licence, he must take it upon the terms the State may see fit to impose. The defendant is not asking for a new licence; he claims the right to exercise the faculties granted him by the licence issued years ago, when party passion had not sapped the fortress of the public reason, nor undermined the temple of our liberties. His franchise is forfeited unless he take an oath purging himself of crimes against the nation and the State; unless he swear he has not committed treason, that he has not sympathized with it; unless he swear that he has committed none of that long catalogue of acts described in sec. 3 of art. 2. His franchise is forfeited without giving him an opportunity of being heard before the judicial tribunals of the country. By the very force of the law itself he is forbidden to use the franchise granted; its value is destroyed, the very thing granted is taken away, until he do—what? Take an oath purging himself of past crimes and offences; not that he will for the future be loyal and obedient, but that he has been so in the past. If Rochester or Bolingbroke had surrendered and stood their trials, the acts of attainder would never have taken effect; but as they did not surrender, they stood attainted. So, if the defendant will take the oath, he shall retain his franchise; but if he will not take the oath, he shall forfeit his franchise. He has the alternative, swear or forfeit. Like the infidel at the sword point of the follower of Mahomet, he has the choice between death and conversion.

Suppose the language of the provisions of the sections of

art. 2, referred to had read in the following manner : "Every attorney or counsellor in this State, under a licence heretofore granted in pursuance of law, who has, at any time previous to the adoption of this Constitution, committed treason against the United States or this State, or who has, by words uttered, manifested his sympathy with those now engaged in rebellion against the United States, or who has sought to avoid the draft into the military service of the United States or the enrolment in the militia of this State, shall forfeit his licence as an attorney," could there be any question in the mind of any reasonable man that such a law would, in principle and effect, be an act of attainder, a law passed for a special purpose, forfeiting the rights and liberties and franchises of every attorney who had done such acts ? True, if a similar penalty had not been previously provided for such acts, the law would be an *ex post facto* law without the provisions of the United States Constitution. Suppose the law had named every attorney in the State, and declared that they were all suspected, and being " suspects," they should forfeit their lands, goods, and chattels, and their licence to practise ; would not that be a bill of attainder complete in all its parts ? Strike out "lands, goods, and chattels " from the statute, would it be any less a bill of attainder ? Strike out the names and insert " every attorney in this State " shall forfeit his licence unless he take his purgation oath that he is an honest man, is it not a bill of attainder, possessing the marked qualities of the English acts of attainder we have cited ?

But it is said that the provisions of secs. 3, 6, 9 & 14 of art. 2, above referred to, do not take away nor impair any civilly vested right. Is that so ? Suppose a preacher has made a contract to preach to a given congregation for ten years and to serve them as pastor ; is that no contract ? And if it be a contract, is it not impaired by fordidding one of the parties to that contract to fulfil his obligation ? Are the franchises of private coporations civilly vested, and does not a law changing the qualifications of their officers affect the rights of such corporations ? Is not a licence to practise law a civilly vested right ? What is a civilly vested right but a right recognized by the law ? True it is, that it is not every vested right that the States of the Union are forbidden by the Constitution of the United States to impair. They are forbidden to affect vested rights by bills of attainder, *ex post facto* laws, or laws affecting the obligations of contracts.

No one can honestly deny that a licence to practise as an attorney is made a privilege by the State, and that the privilege is granted to individuals, and that the grant is for life. Is it in its nature revocable at the will of the Legislature? Of course, I do not refer to the omnipotent power of the English Parliament, but to the limited powers of the legislative bodies in this country. I know of no instance of the revoking of the licence of an attorney, in the whole history of the bar of England or the United States, except as the penalty of some offence committed. That fact alone should be sufficient to show that it is not revocable at will.

Is it revocable because it is an office? Not necessarily; for, by the common law, a man may have an estate in an office, as he may have in a dignity or title. It is well known that in England some offices are hereditary, descending from father to son. The barons of England are hereditary legislators (1 Blk. Com., ch. 12; 2 id. ch. 3); they can lose their nobility only by death or attainder—3 Cruise Dig. 116, tit. Officers. Attorneys are not properly called public officers, for they do not serve the State, but individuals. They are sometimes called officers of the courts, but that is, really, a mere form; they do not serve the law, but merely give their assistance to individuals in securing their rights through the forms and in the methods the law has provided, and for this service they are paid, not by the public but by those who employ them. Now it may be admitted, for the sake of argument, that public officers who are employed by the State and paid by the State, who labor for the public and not for individuals, may be removed in the manner the law provides, or by change of the laws, and that because public policy, as manifested by the history of the country, forbids that any one should have an indefeasible estate in a public office; and thus, it may be properly said, that the relation of public officers to the State does not originate in a contract, that they are paid a salary or fees, that they may devote their services fairly to the community which employs them. In this country, public offices have never been considered as resting upon grants, but it is not so in England. The King may grant the office of an hereditary legislator by issuing to any one a patent to nobility, and in all offices held by patent the grantee has an estate.

But still the provisions of the Constitution recognize the rights of parties, the rights of attorneys, and declare that those rights shall be forfeited as a consequence of the acts

specified in sec. 3. It imposes the penalty, it inflicts upon him the pain of forfeiture as a consequence of uttering words which were not criminal by any law whatever; as a consequence of doing acts, some of which were perfectly legal. To that extent the law is an *ex post facto* law, and therefore violates the Constitution of the United States.

That punishment and pain is the very object of the provisions is manifested to every fair reasoning mind. Change but the form, leaving all the substance, and it would be so plain that no prejudice could remove the conclusion. Instead of saying that no person shall practise as an attorney until he has taken an oath that he has not done the acts specified, say that every one who has done such acts shall forfeit the rights he previously enjoyed, and the weakest intellect could not fail to perceive that the design was to pain those who had done such acts—to punish them by taking away their means of living.

It was held *In re* Attorney's Oath, 20 John. 492, " that attorneys and counsellors do not hold an office of public trust in the sense of the Constitution of New York," "but that they exercise a privilege or franchise." "They enjoy the exclusive privilege of prosecuting the defending suits for clients who may choose to employ them."

The lawyer's profession is his property—Byrne's Adm'r v. Stewart's Adm'r, Dessaus. (S. C.) 475. In Austin's case, 5 Rawle, Gibson, C. J., says: "An attorney is an officer of the court; his office is one for life; the grant of an office without express limitation, at common law, endures for the life of the grantee."

Notice the decision of Tindal, C. J., upon the exclusive rights of the sergeants-at-law to prosecute in the Common Pleas, notwithstanding the King's warrant throwing open the bar—7 Bing. (N. C.) 235, 187; 10 Bing. 571. "We think the warrant of the crown can no more deprive the sergeant, who holds an immemorial office, of the benefits and privileges which belong to it, than it could alter the administration of the law within the court itself."

I need not cite conflicting cases or mere opinions relating to an entirely different state of facts. Under the Test Act, 25 Car. II., ch. 2, and the Corporation Act, 13 Car. II., ch. 1, requiring oaths to be taken, it was held that attorneys did not hold such offices or places of trust as to be required to take the test oath.

It is apparent that the special and exclusive privilege

which the law has given to those who assume the duties of attorney and counsellor, a privilege conferred for life, is such a franchise by the law itself vested that it cannot be taken away except as a penalty for some wrong done, and that penalty to be enforced by due course of law. To deprive a man of his franchises and liberties without just cause duly inquired into, is one of those wrongs which our fathers, when they adopted the Federal Constitution, attempted to prevent. For the State to revoke its grant of lands is an ad-mitted wrong; why is it not as great a wrong to deprive one of a granted franchise, a vested right? I think I have fairly shown that the lawyer's right to follow his profession, after he has received his licence to practice, is a right, a right vested in or belonging to him, a right the law in existence before the the new Constitution was adopted, recognized, granted, and protected; and that if his profession be consid-ered as "*an office*," it is not a public office in which he per-forms duties for the community without the assent of the in-dividual citizen, which the State may alter in accordance with its judgment; but that it is rather a private office, which he exercises for his own emolument, upon the applica-tion of, and for the benefit only of those who choose to employ him. The lawyer, while performing all the duties that any government might have demanded of its citizens during the late rebellion, may have expressed in words his sympathy with those in rebellion. He may, like the great and good Sir Matthew Hale, have been willing to assist in the enforcement of the law as between the State and its citizens, or as be-tween man and man; his judgment may have kept him true to his allegiance, while his feelings may have led him to ex-press sympathy with those in arms, and yet he is to be pun-ished by being deprived of the right to practise his profes-sion. No crime is laid to his charge, no wrong done to the State is preferred against him; but in the utterance of his free thoughts he has dared to say those who administered the public affairs were not entirely in the right, nor those in rebellion wholly in the wrong; that those who had risen in insurrection from following out erroneous political principles were not traitors of the character of those who betrayed their country from lust of gold, or wreaked vengeance for their disappointed ambition by consigning their native land to the horrors and fury of civil strife. And yet for express-ing his opinions merely, he is to stand and be adjudged, at-tainted, and is to forfeit his franchises and liberties. No

chains are placed upon his body, but the bonds are fixed upon his soul—he is taught that the lessons of his past life were falsehoods—he had thought himself a free man; he finds himself a slave who may not speak but as his masters please —he had thought that he could be punished for no act which a previously enacted law had not forbidden him to do; he finds that innocence is treated and punished as crime—he had thought that he might study to learn and to know the truth, and that to what he believed to be the truth he might give utterance; he finds that he must believe and speak what the majority choose to believe and give permission to say— he had thought that religion was a matter between man and his God; he finds that it is a concern between the citizen and the State, and that he must bow at the image of the Baal of the day. In sadness and in sorrow, mourning over the misguided passion of his fellows, he must commune with his own heart, looking for that deliverance which comes at last to every toil-worn suffering son of earth—assured that truth is not known by counting majorities, and remembering that

> " The best of men
> That e'er wore earth about him was a sufferer :
> A soft, meek, patient, humble, tranquil spirit ;
> The first true gentleman that ever breathed,"

was not a favorite of the majority, was attainted, and died.

It may seem to some that these remarks partake more of the character of a popular harangue than of an argument proper to be addressed to a court sitting to decide a case by the rules of law ; but it is for the reason that I am addressing judges, who, by their station and their learning and wisdom, are presumed to be capable of understanding the true force of a course of reasoning, that I thus speak. To thoroughly comprehend the true force and extent of the limitations the people of the United States have placed upon those who administer the government, and upon the States also by the 9 and 10 secs. of art. 2, and the amendments to the Federal Constitution, it is absolutely necessary that we know the history and growth of those principles of duty and right, as between the citizen and the government, which have come down to us from our forefathers. Perfect toleration of opinion is not a virtue common to mankind. He only who has learned through how many struggles and contests we have attained the knowledge of truth we now possess ; how many martyrs have suffered that we may know the blessings of freedom ; how many have toiled on through years of penury

and unrequited labor, that we may enjoy the results of their struggles, and who loves the truth for the truth's sake, will be tolerant. Do we remember that other men have labored, and that we have entered upon the fruits of their labor? More than two generations have passed from the land since the adoption of the Federal Constitution, and the rights and liberties thereby intended to be secured have become to us like household words, often—often upon the lips, but how seldom reaching the heart or controlling the conduct.

How many of us in reading over the chapter in 4th Blackstone, "of offences against God and religion," have thought of the details of that long record of intolerance and persecution which lies covered up in those few pages; and then, remember that of all the nations of civilized, christianized Europe, in England the fires of religious persecution burned the lowest. Read the statutes passed even since the Reformation, stamped as they are with the spirit of the times, and see how slowly England has learned the duty of tolerance alone; the right of religious freedom she has not yet acquired. Study the statutes of 5 Eliz., ch. 1; 27 Eliz., ch. 27; 1 Jas. III., ch. 4; 7 Jas. I., ch. 6; 13 Car. II., stat. 2, ch. 2; 25 Car. II., ch. 2; 11 & 12 Wm. III., ch. 4; 1 Geo. I., stat. 2, ch. 2, ch. 16, and other laws, and what do we see? Every Jesuit and priest declared a traitor, every one harboring them or attending mass declared a felon, those asserting the spiritual supremacy of the Bishop of Rome attainted of *præmunire;* and forfeiting liberty, lands and goods, their blood corrupted, and their very offspring punished for the offences of their fathers.

Read the history of the strife of factions, and then study their statutes of attainders passed from reign to reign; read the chronicles of our own revolutionary struggles, and study the statutes of attainders and treasons passed by the different colonies, the bitter strife between Tories and Whigs, and Whigs and Tories, and we shall then learn that those who adopted the Federal Constitution, who had come out of the fires of civil war, knew whereof they affirmed when they declared that no bills of attainder or *ex post facto* laws should be enacted by either the Federal or State Governments.

Read the chronicles of England's history from the adoption of the right of petition to the return of Charles the II. to the throne, as the absolute master of the lives and liberties of his subjects, had that careless monarch but possessed the strength of mind and firmness of will of his predecessor, the

Lord Protector Cromwell.   Turn over the pages of Rush-worth, look at the ordinance of the long Parliament of April 1, 1643, entitled "An ordinance for sequestrating notorious delinquents' estates," enacting that the estates both real and personal of the bishops named, and of all bishops, deans, chapters, &c., and of all persons ecclesiastical and temporal, who have raised arms against the Parliament, or aided therein, etc., shall be seized and sequestrated, and appoint-ing a committee to enquire into and take charge of such estates, and directing also the estates of all papists to be seized—3 Rush. 309.   Examine also the oath imposed to observe and keep the Solemn League and Covenant; the ordinances of attainders abolishing the book of Common Prayer and establishing the Directory of public worship.   A little further on and, in 1648, one hundred and fifty of the members of Parliament were expelled, the House of Lords abolished, and the minority ruled, and brought Charles I. to the scaffold; and then, for the first time that I can find, was required an oath approving the past acts of the Parliament, and of the execution of the King; an oath which, to his credit be it said, the younger Vane refused to take.   (Fos-ter's Life of Vane.)   But a very few years later, and the remainder of the Parliament were expelled by the soldiers of Cromwell, and my Lord Protector ruled the absolute master of England, Scotland and Ireland, and for a time there was peace.   From Westminster, on December 16, 1653, the Lord Protector issued his declaration, establishing the gov-ernment of England, Scotland and Ireland, vesting in him-self all the legislative and executive power of the realm. That declaration is a curious subject of study—6 Somers' Tracts, 284.   It is a fit match for the present Constitution of France.   The Lord Protector died, leaving no one capable of filling his place, and with joy and bonfires and illumina-tions the people of England welcomed the return of the worthless Charles II. to the throne.   Twelve years were struck from the statute books of England, and the statute of 12 Charles II., ch. 30, is the attainder of him who had been the Lord Protector, and of the regicides.   The ordinance of Parliament had required an oath to support the Solemn League and Covenant; the statute of 13 Car. II., stat. 2, ch. 1, required all magistrates, all holding any office of trust, duty or emolument, to forswear that oath, and to swear that it imposed no obligation upon them; that it was an un-lawful oath, and imposed upon the subjects of this realm

against the known laws and liberties of the kingdom. They were further required, in addition to the oaths of allegiance, adjuration and supremacy, to swear "That it is not lawful upon any pretence whatever to take arms against the King, and I do abhor that traitorous position of taking arms by his authority against his person, or against those that are commissioned by him." Need I cite the "Five Mile Act" of 17 Car. II., stat. 2, ch. 1, in addition to the above oaths, requiring of non-conformists, "That I will not at any time endeavor any alteration of government either in Church or State;" and prohibiting all preaching or teaching contrary to the laws and statutes. See Cromwell's order of Nov. 24, 1655, prohibiting any preaching or teaching by any prelatist, either in public or private, in the family or out of it, and forbidding the use of the book of Comnon Prayer—1 Neal's Hist. Puritans, 157. The Parliament of Charles II. did not better the instruction ; they only reversed the position of the parties.

Nor were our fathers in this country so much superior to the English people, that we can boast of our toleration. Freedom of opinion in this land, what there is of it, has been the growth of the past century. The Constitution of Massachusetts, adopted in 1780, required of all officers the oath that no foreign prelate could have any ecclesiastical or spiritual jurisdiction within the commonwealth, and that oath remained until 1821—Const. Mass. 1780, ch. 6. See also the colonial statutes of South Carolina, Connecticut, Virginia, Maryland, New York, &c. &c.; 1 Hild. Hist. U. S. *passim*, 3 ; id 383 ; 1 Randall's Jefferson, 203 ; Virginia Acts 1659, 1662, 1663, 1705–30, following statutes of Wm. & M.

Not one of the oaths prescribed by the English statutes, that I have read, required the citizen to swear that he had never committed a crime or expressed a sympathy with rebellion—not one required that the officer or the citizen should purge himself of offence, and bear testimony against himself. That is a discovery reserved for our times and our country, and a great invention it is. "Go to," said the Quaker to poor Tray, " I will not kill thee, but I will give thee a bad name," as he turned him into the streets with the cry of "mad dog," and somebody else did kill Tray, and so do the provisions of this new Constitution say: We will not punish treason against the United States or this State, or any other offence mentioned in this long catalogue, but unless thou canst or wilt swear that thou hast done none of these

acts, we will deprive thee of thy means of living, and thy places of honor and profit held by thee of the gift of private individuals—thou shall not serve at the law, nor receive the profits of its profession—thou shall not minister at the altar of God, nor receive a salary from those worshipping thereat—thou shall not teach the young mind the truth, nor receive pay therefor—thou shalt not direct the business of any private corporation, although its wealth be all thine own. We will not punish thee—we are merciful! But go—we proclaim thee an outlaw, disabled from following thy past calling—we forbid thee earth, fire and water, and commend thee to the charity of some other country in which we wish thee all success. No punishment? I defy the history of the world to invent a punishment more refined and ingenious than to punish a man through his love of truth, his adherence to his word. He will not lie, he will not swear a false oath; no matter how guilty he be of offences, he has a regard for the truth and will not lay a perjury to his soul. It is indeed an ingenious punishment; it dispenses with statutes defining offences and providing penalties therefor; it dispenses with courts, with all their paraphernalia of indictments by grand juries and trial by petit juries, executing the law upon offenders; all that is needed, is, that a law be passed every year or two requiring every citizen to swear that he has never wronged or defrauded any one; that he has never slandered his neighbor; that he has never committed murder, burglary, larceny, adultery or fornication; and if he cannot thus swear, then forbid him to follow any profession, trade or calling, for that will not be a punishment inflicted upon him, but a mere regulation of the trades, callings and professions in the State; and to provide such regulations, the State has a most perfect right; nay, more, it may prohibit them all to non-jurors, and still violate no provision of the Constitution of the United States, nor take away any inalienable right of the citizen. Had the Constitution provided, like some of the English statutes, that of 5 Eliz., ch. 1, that persons refusing the oath should be attainted of a *præmunire* upon the first tender, and suffer as in cases of high treason for the second refusal, that would be a punishment, and the law would be void as conflicting with the Constitution of the United States; but as the penalty does not reach to tangible property, nor actually touch the body, it is to be held no punishment, but a mere regulation of the business affairs of the people. Sirs!

> " You take my life
> When you do take the means whereby I live."

" *Requiscat in pace* " was the parting benediction bestowed by the Inquisitors as they turned away from the brother whom they walled up alive in his death-cell. "Go in peace" is the blessing bestowed upon those who may not swear by all the words of this new evangel of liberty.

HOLMES, Judge, delivered the opinion of the court.

At the December term of the Cape Girardeau Circuit Court, in 1865, the defendant was indicted for unlawfully preaching in said county, "without having first taken, subscribed and filed the oath known as the oath of loyalty, as prescribed and set forth in the sixth section of the second article of the Constitution of the State of Missouri." A demurrer to the indictment being overruled, the defendant pleaded not guilty. Being tried, convicted, and fined five hundred dollars, he brings the case to this court by appeal.

The essential question is that of the constitutionality of the oath.

Several other cases have been submitted, involving the same question in reference to preachers, teachers, attorneys, and persons solemnizing marriages. These cases will depend upon the same reasoning, and it will be more convenient to consider them all together.

When this matter came before the court in the case of Garesché v. The State, 36 Mo. 256, and the State v. Cummings, 36 Mo. 263, it did not satisfactorily appear to me that the provisions of the Constitution in question could be judicially declared void as being in violation of that clause in the Federal Constitution which prohibits a State from passing "any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts." That the provisions excluded these persons from the rights and privileges in question was express and clear enough, but that the thing done was prohibited under this clause was neither express nor very clear. There was no precedent that furnished any near parallel to such a case. No decision of the Supreme Court of the Uni-

nited States had precisely defined the meaning of the clause, nor limited the extent to which the application of this prohibition might be carried. We had jurisdiction to construe it for ourselves; but it was a settled rule of construction that an express provision of the Constitution should not be declared void, unless the matter were clear beyond any rational doubt. Under this rule, it is conceived, it would have been the duty of this court, even if some doubt had been entertained, to uphold the Constitution of the State until it should be finally pronounced void by the higher tribunal, in which only was vested the judicial power to make an end of the question.

In Cummings' case, 4 Wall. 277, it was decided that this oath of loyalty in reference to preachers, and so far as relating to past acts, was substantially a bill of pains and penalties, and an *ex post facto* law, within the prohibition, and therefore unconstitutional and void; and the same reasoning was applied to the case of an attorney, arising under the act of Congress, in *Ex parte Garland*, 4 Wall. 333. This decision is absolutely binding on this court in that case; it is not absolutely binding in any other case. In other cases, whether the same or similar in nature, and so far as the principles involved are the same, it has the force of a judicial precedent only. No judicial precedent, however entitled to the gravest consideration and respect, is absolutely binding on any court; but when, by a single precedent, or a series of precedents, an adjudication of the court of last resort has become the established rule of decision in that court, the principles involved and determined should be considered by all inferior courts as definitively settled, and they could not wisely be departed from. Where a question of real property had been decided adversely to the opinion of this court, Scott, J., acquiesced in these words: "As this is a question arising under the laws of the United States, and as the highest tribunal known to the Federal Constitution has pronounced its judgment in relation to it, that judgment is obligatory on this court, whatever opinion might be entertained of its correctness"—Ca-

banné v. Lindell, 12 Mo. 189. It was considered not as directly binding, but as carrying a weight of authority which it would be unwise and useless to disregard. There was no reason to suppose that the decision would be different in another case.

If there were reason to believe that this decision was not really sound law, there might be no impropriety in our refusing to accept it as a controlling precedent. That the court was so equally divided in opinion must necessarily detract much from its weight, but it is still the official judgment of the court constitutionally pronounced. As such, we must consider ourselves in duty bound to follow it, unless convinced, first, that it was against law, and, second, that a different conclusion might, for that reason, be reached in that court in another case. We should not be at liberty to presume any other reason, but we may properly regard this as still open for consideration. If it were necessarily to be regarded as final, it would be proper to yield our own judgment altogether (if adverse); for there must needs be a final determination somewhere: *interest reipublicæ ut sit finis litium.*

In the cases of Blair v. Ridgely and State v. Woodson, the majority of the court held that this decision was not decisive of the case of a voter or office-holder. I did not deem it necessary to give an opinion on the constitutionality of the oath in those cases. Nor is it necessary that I should consider, here, whether there be any or what grounds of distinction, which may take those cases out of the reasoning on which this opinion proceeds.

If it were clear that the precedent should be regarded as established in reference to the cases now before us, we might rest our decision on that authority alone. But a precedent is only evidence of what the law is. Other cases may involve a new application of law to facts. We are to decide every case according to law, upon all precedents and principles together. If we accept the precedent as authority, with or without a discussion of the reasons on which it rests, we

must thereby admit it to be law for these cases.  I conceive it to be proper, therefore, that I should re-examine the subject as briefly as possible (considering its inherent difficulties), and rather for the justification of my own conclusion than as furnishing a guide or a light to others who may be more capable of judging the question for themselves.

These persons were entitled to the benefit of the legal presumption of innocence, in conformity with those great principles of public law which constitute a part of the law of nations governing the case of civil war, the authority of which I suppose to be recognized by the Constitution of the United States—1 Kent's Com. 1; Wheat. Elem. Int. Law by Dana, ch. 1, §§ 9–15, n. 32 on p. 84, n. 153 on p. 374; Prize Cases, 2 Black, 635; 1 Greenl. Ev. § 5.  To the extent to which this law may have force and application here, it is a law superior to the Constitution of this State.  According to this law (Vattel, bk. 3, ch. 18, §§ 291–4, & bk. 4, ch. 2, § 20), when a civil war ends by the submission of the rebels, " it becomes necessary to grant an amnesty where the offenders are numerous," and "when the amnesty is once published and accepted, all the past must be buried in oblivion ; nor must any one be called to account for what has been done during the disturbances," and "the sovereign, whose word ought ever to be sacred, is bound to the faithful observance of every promise he has made, even to rebels"; but he may except from the amnesty the authors of the disturbances, the leaders of the party; he may bring them to a legal trial, and punish them if they be found guilty ; but "the end of peace is to extinguish all subjects of discord."  An amnesty is " a perfect oblivion of the past," and, subject to the exceptions, the amnesty exists even without a treaty, and, "by the very nature of the peace, is necessarily implied in it," and " peace restores the two nations to their natural state."  The military government may continue until the regular civil authorities are fully established, but the amnesty must be made effectual.  An amnesty for prisoners of war may have been involved in the surrender of the rebel armies, and it had been

proclaimed for others (with exceptions) when this Constitution was adopted.

These doctrines are certainly consonant to reason and the nature of things. It would manifestly be impracticable to punish all, and absurd to attempt it. The mass of offenders must be pardoned, and when pardoned their past offences must be buried in oblivion. Those who were citizens, and became rebels and criminals in law, are thus restored to their former state and condition of citizenship, and must be henceforth presumed in law to be innocent like all other persons, until convicted of some new offence. They return to allegiance and to obedience to the laws. Allegiance and citizenship are reciprocal and correlative obligations. They are entitled to the common benefit of the laws and government that are established, and to nothing more. Nothing more can be required of them by the civil state; and it must be admitted that their opinions and feelings, when not put forth in any new act of resistance to the laws, belong to themselves, and cannot, with reason and justice, nor lawfully, be punished as if they were offences against law.

It is unquestionable that the right of trial by jury in any criminal case, and the presumption of innocence involved therein, is protected by the Federal Constitution, and could not be infringed by a State.

The next thing to be clearly ascertained is, what were these rights to teach, preach, practise law, solemnize marriages, &c., and what was really done, with respect to them, when the new Constitution was ordained.

I premise that natural rights, merely as such, do not fall within the domain of civil jurisprudence: they belong to the *forum* of nature. They are doubtless highly important, and, for anything that we may judicially know, ought to be. *inalienable;* but perhaps, in point of fact, they are not; for in the *forum* of mere nature there is no tribunal to adjudge, no sanction but the eternal justice, or the right of might, and no execution but the vengeance of Nemesis—1 Black. Com. 138 ; 2 id. 18 ; Kant's Metaphys. of Eth. & Law, (Edinb.,

1836). We sit here in the civil *forum*, and we are to adjudicate upon civil rights, under the established government, and according to civil laws ; and if any of these things were civil rights, they must have been created such by the laws and government of this State, or of the United States.

Natural rights, I take it, are raised into civil rights by the established government and laws, and civil rights are such only as they are so created, defined, secured, and made to be, and nothing other. The civil rights which are thus given and secured constitute civil or political liberty, which is never anything else. Civil and religious liberties are political rights, says Mr. Justice Catron—Permoli v. Municipality, 3 How. (U. S.) 610. Vested rights of property or contract, when they exist by law, are recognized as civil rights by the clause relating to the obligation of contracts, and are protected as such. None of these things were such vested rights : I do not understand that it is claimed that they were. They were not of the nature of property or contract at all. The right to " life, liberty, and property" (that is, personal security, personal locomotion or freedom from arrest, and private property), where it exists, is protected by the Federal Bill of Rights from being taken away, in any criminal case, without due process of law—Const. U. S., Amend. Art. V. ; 1 Black. Com. 128 ; Sto. Const. § 926 ; Smith's Com. § 593. So far as these things were of the nature of such rights, they either did not exist in these persons, or, if they existed, they were not taken away. I suppose it is not contended that they were, unless the penalties consequent upon a violation of the Constitution may be said to have that effect when enforced. No other clause of the Federal Constitution is referred to, and I presume none can be cited, that undertakes to make any of these things civil rights. It must follow, then, that if they were such rights, they owed their existence as such to the Constitution and laws of this State, and to no other civil power, and were a part of the civil liberty thereby established.

It may be admitted that all these positions, functions, and

professions, were naked civil rights in this State, under the old Constitution. That the right to practise law, or solemnize marriages, was created and defined by the Constitution and laws then in force here, and by no other civil authority, can scarcely admit of question; and that all the rest were to some extent defined, and secured or protected, and thus made civil rights so far, by the same power and laws, would seem to be equally clear. They were of such a nature as very nearly and greatly to affect the good government and safety of the State, and they were an important part of the rights and liberties of the people. They existed under the old Constitution, and they would exist under the present one if the special provisions in question were abrogated or declared void; and they were taken away only by a change in the Constitution itself.

All these things were thus clearly matters of internal government and civil institution in this State. The old Constitution gave the people power to alter or abolish their Constitution, and, in so doing, to abrogate or revoke these naked civil rights, as they might deem fit and necessary for the common safety and happiness of the body politic. The Convention was expressly directed to frame such a constitution as might be "by them deemed essential for the promotion of the public good." Their power to give or withhold, to abrogate or modify, these civil rights, for purposes of good government, was unquestionably sovereign and absolute. The prohibitory clause was not in itself a limitation on the exercise of this power for this purpose. It would be purely an exercise of the political power, wherein it was sovereign and unrestricted. As to these persons from whom these particular rights and liberties were taken away, or to whom they were not given or secured, it was in one sense a deprivation of civil rights, and in every sense a loss or diminution of civil liberty. In the first place, it would not be quite correct to call this a deprivation of rights, or certainly not in any sense of punishment: more properly it would be said that all persons within the State surrender for the public good so much

of their natural or civil rights as the majority, when establishing a new government, may deem fit and necessary that they should surrender for that purpose, when no higher authority intervenes; and this is wholly a matter of political wisdom. . In the second place, it is perfectly plain that if such deprivation of rights were necessarily to be regarded as punishment, the Constitution could never be altered, amended, or abolished at all, nor the laws changed otherwise than by enlarging these rights and liberties for everybody; and this would be next to impossible. So far it must be admitted that the question is wholly political, and not judicial, in its nature.

A judicial question can arise here only by finding some higher positive law by which the sovereign power of the Convention and people was restricted. It is not claimed that such superior law can be found anywhere else than in this prohibitory clause, nor in that, unless these provisions can be held to change the criminal law, or the rules of evidence, in relation to past acts, or can be declared to be a legislative sentence of punishment for supposed criminal offences, or past conduct assumed to be criminal; and whether the enactment were this thing (raising a judicial question), or that other (raising a political question only), must necessarily depend upon the object, scope, and intent of the act itself. If the operation and intention were to punish these persons for such past conduct as criminal, I suppose it might be said to be a bill of pains and penalties; but if it were really, by scope and intention, a measure of political wisdom only, looking to the good government of the State, however mistaken in policy, and neither designed nor declared as punishment at all, I do not see that it could be rightly called such a bill.

It appears to me that. any *ex post facto* elements which might possibly be found in it, may be considered as merged in the graver character of a bill of pains and penalties. For if the administration of the oath could be regarded as the criminal proceeding to which these elements relate, it would still be the enactment itself, if anything, which changed the

law of crimes, or the rules of evidence, retrospectively ; and if it be a bill of pains and penalties, it must be the enactment itself which assumes judicial magistracy, weighs the offence and the proofs, decides upon the political necessity and moral fitness of the penal judgment, declares the guilt, and fixes the punishment.

The requisition of the oath can be no more than the execution of the sentence. No other trial or criminal proceeding than that which may be found in the act itself could possibly have been contemplated. The administration of the oath is in itself, I think, clearly a civil proceeding only ; but as a mode of executing sentence it may be considered as a part of the legislative judgment. The criminal proceeding, then, must lie in the force of the enactment, or there is none at all ; and without some criminal proceeding, or some decisive penal character, I do not see that it can by any possibility be an *ex post facto* law in the sense of jurists. If it be a bill of pains and penalties, that is enough. By no construction, it seems to me, can these provisions be an *ex post facto* law, or necessarily punitive in character, without being also a bill of pains and penalties ; and, to my mind, if it be not the latter, it is neither. In order to make it such a bill, it would seem to be essential that it should punish a past act *as criminal*—Calder v. Bull, 3 Dall. 390.

Ordinarily the word *bill* or *law* would import an act of the Legislature ; but in civil jurisprudence an ordinance or constitution of the supreme power in the State would be considered, I presume, as an act of legislation. I suppose, then, that these words may include this Constitution. Such bills in England were acts of Parliament. The power of Parliament was more nearly that of a State Convention with us than that of a Legislature sitting under a written constitution ; and if by any latitude of construction this clause can be applied to conventions of the people assembled for the purpose of founding a new constitution of government, it would seem to be reasonable that the intention to enact such bills should be unequivocal and clear.

There is a class of cases in which acts of the Legislature have been tried by the supreme law of the Constitution (State or Federal) under which the Legislature sat, and been held void as being of the nature of punishment without trial, because the Legislature, in such case, had no power to divest civil rights, vested or naked, which were by such higher authority secured against legislative action in any other way, or for any other purpose, than as a penalty for crime to be imposed on judicial conviction—Taylor v. Porter, 4 Hill, 140. Such was the case of Fletcher v. Peck, 6 Cranch, 138, where a vested right of property was taken away by an act of the State Legislature, which had no power to do such a thing otherwise than as a punishment on conviction. It was therefore necessarily to be inferred that it was done for punishment, because it had that direct effect; and, being done by legislative act, and not by judicial sentence, it was held to have the operation of an *ex post facto* law, punishing the party for the supposed offences of his grantors. It was necessarily equivalent to punishment without trial. No other purpose could be alleged or heard. Such deprivation of rights as this, I should readily admit, could be regarded in no other light than as punishment in the legal sense.

Before these cases, or this principle, can have an application here, it must be shown that this enactment was, by the same or some like reasoning, necessarily equivalent to punishment for past conduct. The prohibitory clause may be considered as excepting out of the absolute sovereignty of the Convention all power of depriving persons of civil rights, as and for a sentence of punishment, without trial, or in a way that changed the criminal law, or the rules of evidence, retrospectively.

One view says that the Constitution was ordained in political wisdom for purposes of good government, with no object or intent to punish these persons for supposed criminal offences, and that it came therefore within the civil power wherein it was absolutely sovereign : the other view says that by the very scope and intention of the enactment itself it did punish

for such past conduct, and was a legislative sentence without trial for the treasons and other assumed offences involved in the acts specified.   On this issue the whole matter turns. Which view is the correct one ?

It does not appear by the tenor, nor in any other way, that the Convention had no power to divest persons of these naked civil rights otherwise than as a penalty for crime on conviction.   It is not, then, upon this ground, necessarily equivalent to punishment, and it is not, therefore, for that reason necessarily to be regarded as punishment.   It is obvious that the question here must depend wholly upon what was the direct scope, object, and real intention of the act.   If it were simply a measure of political wisdom, for purposes of good government, it was a matter within the sovereign power, and valid beyond the reach of judicial condemnation.   To bring it within the definition of such bills and raise a judicial question on this prohibition, it is absolutely necessary that it should be such by the very scope, operation and intention of it.   I see no other legitimate way of showing that it can be regarded in no other light than as punishment.

In what manner is this to be determined ?   And, first, what tribunal is to decide what is a measure of political wisdom, and what are purposes of good government?   I must answer, the people in Convention assembled, absolutely for themselves.   And, second, who is to decide whether this enactment was such a measure or not—whether or not it was, in its actual effect and real intention, not such a measure at all, but an *ex post facto* law, or a legislative sentence of punishment?   Here I must answer, the court sitting in judgment upon this judicial question.   It is to be determined according to the established rules of construction, among which I find these : that the object of all rules and maxims of interpretation or construction is, if possible, to discover the *true intention* of the law ; that the intention must prevail over the literal sense of terms, and " is to be taken or presumed according to what is consonant to reason and good discretion" (1 Kent's Com. 462 ; Smith's Com. § 515–45 ; 1 Dom.

Civ. Law by Cush. 118–25); that we are look to the nature, object, scope and design of the act, and give to words such operation as may fairly secure the ends proposed (Prigg v. Com. of Penn., 16 Pet. 610; 1 Sto. Com. § 405, 405 a.) ; that where the words are express, the meaning clear, and the intention well known, it must govern, however unwise the law may seem to be (Smith's Com. § 501, § 465); that if on the face of the enactment this intention be doubtful, we may look into the attending circumstances and condition of the people, into matters of public history affecting the whole people, and public matters affecting the government of the country (1 Greenl. Ev. § 5) ; but if the intention of the law be plain and intelligible, we cannot allow ourselves to find in any reference to extraneous matters any authority for interpolating either a grant of power or a restriction on power granted (Hamilton v. County Ct., 15 Mo. 23 ) ; that in case of implied limitation or prohibition of power, it is not sufficient to show a possible or potential inconvenience, but there must be a plain incompatibility, repugnancy, or an extreme practical inconvenience leading irresistibly to the same conclusion (1 Sto. Com. § 477) ; that we are not to substitute other language, nor our own notions of what the framers intended, but are to seek for the thought which is expressed; that it is not the intention of the members which is to govern, but that of the law which they have enacted ; and that the legislative body must be understood to have employed words in their natural sense, and to have intended what they have said (Gibbons v. Ogden, 9 Wheat. 188; Fletcher v. Peck, 6 Cranch, 130; Newell v. People, 3 Seld. 97 ; Sedgw. Stat. & Const. Law, 246) ; that we are not to lose sight of the instrument itself, nor look beyond it "and roam at large in the boundless field of speculation," where it is plain and explicit and can mean but one thing (People v. Purdy, 2 Hill, 36) ; that it cannot be presumed to admit of any recondite meaning or any extraordinary gloss (1 Sto. Com. § 451) ; that the whole must be taken together, and, if possible, reconciled into harmony

(Sedgw. 237; 1 Sto. Com. § 455); and, finally, that the clear scope, object, effect, and intention of the law, as made, must govern absolutely, and cannot be overborne nor evaded by judicial construction.

There is no case here for the interpretation of the meaning of words : there is no ambiguity in the language. The only question there can be is, what was effected, and what was the object and intention of what was so done? The intent of the law is to be gathered from the enactment itself, and that, when ascertained, must be presumed to have been the intention of the legislative body. The motives, objects, and reasons of the members are not in question ; they are not examinable in a court of justice; and neither their motives, however patriotic or corrupt, nor their reasons, however sufficient for themselves, or insufficient for us, can be allowed to change the nature and effect of the law which they have enacted—Fletcher v. Peck, 6 Cranch, 130. Even where it is permissible to look into the extraneous matters, it is not the intention of the legislators, but that of the legislative body as embodied in the enactment, which is the subject of inquiry.

Penal acts usually prescribe the penalties for criminal offences with express clearness and precision. The known examples of bills of this nature contain bold, explicit, and unmistakable declarations of the object, the punishment, and the persons. The precedents of *ex post facto* laws admit of no other rational construction. Deprivations, disqualifications and disabilities of this kind have often, in the history of penal legislation, been thus prescribed by law as a punishment for crime ; and when so declared, in whatever form, they are doubtless to be regarded as punishment in the legal sense. There is no such explicit declaration here : if there be any at all, it must lie in the effective operation. It must be presumed that the intention was to do what is actually done, and this is to be found in the operation and effect of the act. What, then, was done? That all these persons were absolutely excluded from the exercise of these privi-

leges, offices, places and functions, and deprived of civil rights which they had previously enjoyed, is certain enough. This portion of their civil rights and liberties was taken away. There is certainly no defining of qualifications or disqualifications of these persons for any of these things : as to them, it is clearly at one sweep an absolute exclusion. I believe no one has ever denied this. The oath is not directed for this purpose : they are all forbidden to take it under the penalties of perjury. None of them could take it, and it was clearly not intended that they should. It is only the other portion of the people, who were not deprived of these rights and liberties, who are to take the oath, or do these things at all ; and it is plainly required of them only for the purpose of ascertaining that they belong to this class, and possess the rights and liberties. All this was intended by the act itself to be done. This the Convention plainly intended to do ; and this unquestionably it had the sovereign power to do for the purposes of good government, and with the object of securing the well-being and safety of the State. It is equally clear that it had no power to accomplish such objects and purposes by means of an *ex post facto* law or a bill of pains and penalties.

The expressly declared object of the whole instrument was "the more certain security of our liberties and the better government of this State." There is no good reason for doubting that this was the general object and purpose of the Convention. It would neither be reasonable, nor according to the rules of construction, to presume that the law was aimed at these persons *as criminal offenders :* such aim must be found in the provisions of the act if anywhere.     •

The most favorable view I am able to find in support of the enactment may be stated thus : it may be said that these persons out of the whole community were to identify themselves by their own knowledge that they had done some one or more of these acts, not that the acts were therein regarded as crimes, however they might be found to be such on a judicial trial, but that the persons who had done the acts,

whether criminal or not, were deemed, in the political wisdom of the Convention and people, for the time being, not to be safe and suitable persons to have and enjoy these rights, or be entrusted with places, privileges and functions that so nearly affected the well-being and safety of the body politic; that the criminality of the acts was in no way adjudged, nor passed into a sentence of punishment; that the oath merely ascertains who have these rights and liberties, but not the guilt or innocence of those who have them not; that it was aimed at a portion of the inhabitants with a view to the actual condition of the State and people, and with reference to their future safety and well-being, and had no object or intent to punish them as criminals; but that their having done these acts, their notorious disloyalty under the old Constitution, and their well known abuse of these rights and liberties when they had them, were, not a reason why they were deemed guilty of offences for which they were punished, but a well grounded and just cause why the civil power in its wisdom judged it necessary, wise, and fit, for the future safety and good government of the State, that this description of persons should be thus excluded, for such time as the State might think prudent, from this part of the common rights and privileges of citizenship.

It might be said that this purpose was further manifest in the provision made for enabling the Legislature alone, after a certain time, to repeal these special clauses and restore these persons to full and equal rights; wherein it is indicated that the object was not to punish them, however culpable, but to secure the peace, order and safety of the whole; and that all this was a matter of political judgment over which the courts have no control. If this view could be justified, it would be clear that the question would be wholly political and not judicial in its nature; and the matter would fall within that class of cases in which it is held, that, for any wrong or injustice done in the exercise of the political sovereignty, there is no remedy but in an appeal to the political constituencies.

This reasoning would assume that the past acts were not the reason of the deprivation or exclusion, but a reason why the enactment had become a necessary measure of political wisdom. Any other view might seem to imply that the Convention had forgotten its duties, and insidiously set about finding out a way of evading the Federal Constitution, and inflicting penalties upon persons who were to be presumed to be innocent of everything criminal, and whom they presumptively knew not to be punishable without trial for their past offences. To impute any such lurking intention to the Convention would certainly be unjustifiable. There is no need of that. We are not to look beyond the enactment itself; nor is there any occasion to search for any extraordinary gloss beyond its obvious effect and necessary operation.

It is indisputable that the exclusions and disabilities refer directly to the enumerated acts. The oath expressly relates to them. The acts are plainly the immediate reason and sole ground of these special provisions. It may reasonably be said that in them it is virtually assumed that all these persons had done some one or more of these acts, of which some were manifestly crimes, and all are dealt with in the same way as if they were of like nature (and that large numbers were guilty in point of fact was not only true, but well known to almost everybody—not, indeed, by legal proof on trial, but by general information), the truth of which assumption they were obliged to confess by the impossibility of their taking the oath; thus (as it may fairly be said), effectually changing the rules of evidence, and subverting the presumption of innocence retrospectively in every individual case, contrary to right reason, the law of nations, and the national right of trial by jury in criminal cases; and they were thus effectually deprived of these rights and liberties, and for that reason. The only condition allowed for escape was the oath known to be impossible for them. The persons to be affected are thus sufficiently designated for all the purposes of visiting the deprivation on them with inevitable certainty. The deprivations are in themselves of such a character, that, if

they had been expressly declared as and for a penalty for crime, or for any of these acts, they would have constituted indisputably a severe degree of punishment. The operation of the law enacted, upon them, is really just the same as if it had been so expressly declared. It may justly be said, therefore, that the declaration as and for punishment for these acts as criminal is actually involved and contained, and is necessarily to be implied, in what is enacted. This whole import is really there by the natural and obvious sense of the language, and by the necessary operation and effect of the law, though not expressed in set terms. It must be presumed that the legislative body intended to do what is actually done, and that would seem to be, essentially, nothing less than a legislative sentence of punishment for past conduct as criminal; and so it may be concluded, that the act itself assumes judicial magistracy, weighs the offence and the proofs, decides upon the necessity and fitness of the penal judgment, assumes the guilt, ascertains the persons, and declares the punishment. It is thus shown that the act itself alone is necessarily equivalent to punishment, and comes within the principle of such bills. As such, it must be held to be an exercise of the civil power of the State, not wherein it was sovereign and absolute, but wherein it was limited and forbidden.

Comparing these views, it is evident that the one looks to the object and intention more especially in the political bearing, the other in the strictly legal; the one considers the operation of the law upon the whole body politic in reference to good government, the other its special operation upon these persons with reference to their personal rights and liberties; the one follows the political reasons, the other the legal principle; the one regards rather the intention of the Convention, the other that of the law which was enacted; the one the general, the other the particular intention. In the judgment of the former view, the conclusion of the latter appears to be based upon a consequential operation and a remotely punitive character argumentatively drawn out,

and not upon the meaning of language, nor upon the obvious and direct effect of what is said and done, nor upon the true object and intention of the enactment at all, which, under the rules of construction, was the very thing to be discovered; and it supposes the true intention to be inferred by the other, not from anything contained in the act, but from the argumentative deduction of a resulting penal consequence of a general nature, which is confounded with legal penalty, and therefore assigned improperly as the true object, scope, and intention of the law.

It seems to me that the real question must turn upon the consideration whether the more general, or the special and particular, operation and intention are to govern in determining what is to be considered in law the true ground, reason, and nature of this enactment. If the former is to govern, then it would be plain that the punitive character would be only a remote consequence and an inferential result, but not the real object, operation, and intention of the law; but if the latter is to prevail, then the political object is to be held subordinate, or left wholly out of view; the purposes of good government could no longer be allowed as the true object and intention of the law as made; the question of the intention would have to be confined to what is said and done with regard to the individual rights and liberties of these persons; and the latter view, which regards the act as essentially penal in its operation on them, as necessarily punitive in character and a sentence of punishment for past conduct as criminal, must prevail; and it might justly be said that it could be regarded judicially in no other light.

The decision of the Supreme Court of the United States holds that such is the essential nature and character of the enactment within the meaning of the prohibitory clause. I must concede that I have been unable to find satisfactory grounds on which I could venture to deny the reasonableness of that opinion, or refuse to accept it as an authoritative precedent. Such being the character of the act, the prohibitory clause is itself the supreme law by which it is to be

judged and condemned. It is thereby taken out of the category of a measure of political wisdom for purposes of good government.

Under the proper rules of construction, the judicial mind, I think, may reasonably conclude that such was the real nature and intention of the law, as it stands enacted, whatever may have been the intentions of the legislators. It is probable that they considered the matter in its political bearing only. The politic reasons may have been very just and sound; but no reasons of policy whatever can be heard in support of a law which the Convention was prohibited from passing for any purpose, and had no power to enact. Neither can it be presumed that the Convention considered these past acts only as a reason which rendered these persons unfit for citizenship, or incapacitated them for the further exercise of these civil rights and functions in the State. Such a presumption would not be consonant to reason and sound judgment: it would be in conflict with the law of nations and those fundamental principles on which our systems of government are founded. The rules of construction will not allow such reasoning to be imputed to the legislative body. Nor is it necessary to suppose that the members actually thought of punishing these persons in this way, nor that they were at all aware that they were enacting a bill of attainder or an *ex post facto* law. It may reasonably be inferred that they had overlooked the penal aspect of the matter, as well as the bearing of this clause upon it. At all events, it is necessarily to be concluded that they had fallen into some misconception of their lawful powers, or of the legal operation of the provisions which they adopted. Nor should there be anything wonderful in this, when the question has perplexed and divided the most learned jurists.

If the public good could be regarded, judicially, as the sole ground, real object, and true intention of the law as made, then it might be nothing to the purpose that the consequential result and remotely punitive effect upon these persons were really just as severe as if a bill of pains and penalties

had been enacted against them. There can be no doubt that upon a change of the Constitution, such rights and privileges, being inconsistent with the new government, may be abolished—Terrett v. Taylor, 9 Cranch, 51; *In re* Lee, 21 N. Y. 12. There have been many instances, in several States, where public offices and private rights of this nature, and of great value, have been annulled by such ordinances—Butler v. Pennsylvania, 10 How. (U. S.) 415; State v. McBride, 4 Mo. 303; State v. Bernoudy, 40 Mo. 192. The laws are abolished, and the private rights, which depended on them for their existence or continuation, are thereby annihilated, for such reasons as may seem good to the State. It has always been considered as done for purposes of good government and as a matter of civil institution. The reasons are no usually given in such ordinances, nor is it supposed that they could be made to appear by any reference to extrinsic matters. Even if there were some reason to believe from anything contained in the act itself, that, aside from the public good, some reference was had to past conduct of the persons concerned, or even to acts which might be criminal in their nature, it is not to be supposed that the courts could assume that the thing was done on account of such past conduct rather than for the purposes of good government, unless it were so declared in the act itself in plain terms, or by actual import and necessary implication; nor that an argumentative deduction of a resulting punitive effect upon the sufferers would be sufficient to make the act a bill of pains and penalties. Such reasoning might take a wide range, and if there were no limit to the latitude of construction there might be danger that the control of the people over their own Constitution and laws would be surrendered to another power. It would not be true that such remote consequential result could be regarded in no other light than as punishment; it could be, and no doubt ought to be, in such case, considered only as the ordinary and unavoidable effect of the exercise of the political power for the public good, and in reference to the individuals as a surrender of rights and privi-

leges for the good of the body politic. It is not believed that
any such remote result would make an act a bill of attainder
or an ex post facto law. It is not enough that it should in-
cidentally partake of the character of such bills: it must
actually be such a bill or law. In order to make it such, I
should say it must be so, either by the natural and obvious
sense of language, or by the direct scope, necessary operation
and true intention of the law as it was enacted, admitting of
no other rational construction, capable of correct explanation
upon no other principle, resting not upon slight implication,
but upon actual import and necessary implication; not upon
potential inconvenience and vague conjecture, but upon a
strong conviction of incompatibility, of plain and irresistible
repugnancy, and being "a clear unequivocal breach of the Con-
stitution, not a doubtful and argumentative implication;"
for, by all principle and authority, it is in such case only
that an act of the Legislature, or the Constitution of a State,
is to be judicially declared void as being in conflict with the
Federal Constitution—Fletcher v. Peck, 6 Cranch, 128; Dart-
mouth College v. Woodward, 4 Wheat. 625; Cooper v. Tel-
fair, 4 Dall. 14; Butler v. Pennsylvania, 10 How. (U. S.)
415; 1 Sto. Const. §§ 416, 447.

When deprivation of civil rights is prescribed by law as
a penalty for criminal offences, on conviction, it is done for
the reason that the public good requires it to be done. This
is a thing which the Federal Constitution does not forbid; it
is only the imposition of a criminal penalty otherwise than
upon trial by jury that is prohibited; and it might be sup-
posed here that these persons were subjected to exclusions
and disabilities for that same reason and by virtue of the
same authority. It is very probable that this consideration
had its weight with the Convention; but they have, in ex-
press terms, embodied these past acts of a criminal nature in
the enactment itself as the immediate and plain reason and
sole ground of the law enacted as against these persons, and
in reference to the private rights of which they were de-
prived. The oath and other special proceedings touching

these persons directly relate to these acts as their immediate ground and reason, and they are subjected to the deprivations for that same reason, whatever other reasons there may have been. This being so, it is nothing to the purpose that the political reason for passing such an act was the public good. The act which is passed is penal in its own nature; it is such by its own actual import, and therefore by necessary implication; and the penal law is carried into execution without trial: whence it is clearly manifest that the civil power was exercised, in this, not wherein it was sovereign and absolute, but wherein it was restricted and forbidden.

If the true intention could be considered so far doubtful as to warrant us in looking into the extraneous history for further light, and it were at all allowable (as it is not) for us to inquire into the motives and reasons of the legislators, it would no doubt appear that they thought only of good government and the public safety, and had no idea of inflicting punishment on culprits whose crimes, if punishable at all, might be capital offences. Nor are these disabilities to be regarded as punishment in addition to the penalties of treason; for whatever they are they fall upon persons whom the law must presume to be innocent of criminal offence, and who might not be punishable even for their past treasons. The extraneous history would not show that the enumerated acts were not the true ground and reason of these special provisions: it would reveal no more than that the acts may have been considered, in a politic view, as a sound and just reason and a good cause why this Convention had become a political necessity, and this enactment a just measure of political wisdom and a prudent foresight (as in that view it may very well have been); and in this same aspect it might with reason be said that the reference to the acts was merely for description of the persons excluded, and that the oath was purely a civil proceeding within the authorities—Watson v. Mercer, 8 Pet. 110.

But if there be any force in what has been said, this law as made is essentially penal in character, is necessarily equiv-

alent to punishment in the legal sense, and is a law which by its own force declares and executes the punishment. In such case, I must admit that no one can be heard to say, not even the members themselves, that the intention was not to punish these persons for those past acts as criminal, but only to found a good government and secure the safety of the State; for the saying would be of a matter extrinsic, and would contradict the proper scope, operation and effect of the enactment itself. Though it might be gathered from the general tenor and purposes of the Constitution that they honestly believed they had the power, and deemed the measure just and necessary (as it might well seem to be in a political or moral point of view), yet it must be apparent to the judicial mind that the thing done was prohibited, and they could not be listened to; for no citizen, not even a rebel restored to citizenship, could be deprived of his civil rights and liberties in that way and for that reason, even for the public good, either on account of his crimes, his moral character, or his opinions merely. It would clearly subvert the national right of trial by jury and contravene this prohibition. A government so proceeding might be a good despotism, but certainly a very bad republic; and hence the reason of the prohibition. The court must see therein the operation of mistaken views of political necessity or expediency, unreasonable fears, or ungrounded suspicions, directly overriding a positive law— Sto. Const. § 678. It is not possible to render rebellion forever impossible any more than murder; and the government must be presumed, in legal theory, to be always capable of punishing crime by due course of law, and of putting down rebellion by force of arms, whenever it shall raise its head: *in rege, qui recte regit, necessaria sunt duo hæc, arma videlicet et leges.*

It may fairly be concluded that the provisions come within the rule that would authorize the court to declare them void; that the thing admits of no other rational construction, and rests not upon slight implication, but upon actual import and necessary implication—not upon argu-

mentative deduction merely, but upon "a clear and strong conviction of incompatibility," and is on the whole (what the precedents would require it to be) "no doubtful case." The higher tribunal has in effect so declared. I am not so clear to the contrary that I can venture to gainsay the correctness of that decision.

I must admit that these exclusions are not of the nature of qualifications at all; and the reason is, that they are not really intended as general laws nor as a permanent institution, either with reference to the fitness of these persons for these special duties and functions, or with reference to the public safety in any proper sense, but are temporary disabilities imposed on a class of persons on account of their reprehensible past acts and their apprehended future bad conduct. That they were to be temporary only is sufficiently apparent from the tenor of the Constitution; for though they might continue in force indefinitely, if not repealed by the Legislature soon after the time limited for that purpose, it was nevertheless plainly contemplated that they would be repealed after a few years. They were not expected to remain a permanent part of the Constitution, and were evidently not intended as a perpetual regulation. In this respect they are clearly distinguishable from those general laws and permanent institutions of government which are really intended to have an equal bearing upon the whole community, and upon each individual so far as in the nature of things they may be applicable to him, and which exclude naturalized citizens, denizens, women, superannuated men, minors, negroes, Indians, and the like, from certain political powers, public offices, or civil functions. This exclusion is plainly founded upon natural, inherent and permanent incapacities, and looks only to the first necessities of good government. Such laws are consonant to reason, and are, in truth, wise, necessary and just measures of political wisdom. They are clearly not of the nature of punishment; they are in no sense penal enactments; and they fall therefore within the unrestricted sovereignty.

That the Constitution effects a serious loss or diminution of civil liberty in all these persons, and that the deprivations and disabilities operate upon them as a severe punishment in a general sense, no one can entertain any doubt; and if they were declared by law as a part of the sentence on conviction for criminal offences, every one would concede that they would be a heavy punishment in the legal sense. If there were no limitation on the civil power of the State that could save these rights and liberties out of the absolute sovereignty of the people in Convention assembled, this result, however severe or well deserved, could be regarded only as a loss of civil liberty, for which there would be no relief but in an appeal to the people for a change in the Constitution. The existence of such superior law depends upon the construction to be given to this prohibitory clause. Its application here depends upon the operation and intention of this special enactment. The vital turning point would seem to lie in the question, whether the deprivations and disabilities are therein declared as and for a penalty for past acts assumed to be of a criminal nature. This declaration is certainly not made in express words, but it may fairly be said to exist by necessary implication. The decision in question is clearly to this effect. I am not prepared to say that it is not sound law, a proper construction, and, on the whole, the better opinion.

The matter is to be considered here as a judicial question only; and it can make no difference whether the subject be viewed with reference to the present time, or with reference to the state of affairs which existed when the Constitution was framed. Then the civil war had not come to an end; the amnesty had not been proclaimed; a large part of the State was still the scene of strife, and the disturbances had not wholly ceased when the Constitution was adopted. These powers, offices, and functions, had been made an instrument of sedition, and a means of aiding rebellion. They were of such a nature as largely to admit of a dangerous influence in the future. It was doubtless contemplated that some time would be required for the restoration of peace and public or-

der. It might be difficult for any one to say that all apprehension was groundless; that this measure was not a wise and just political foresight; or that there was any intention to trample upon the rights of innocent persons. These things were matters of political judgment: they do not touch the legal question. Nor can we listen to arguments founded only upon the natural justice or injustice of such legislation, nor to historical examples of prodigious oaths : such considerations would more properly be addressed to the political constituencies. If the judiciary could hear them, they might possibly conclude that treason, rebellion and disloyalty to a just government were still more enormous, and that in the establishing of a new Constitution the safety of the people was the supreme law.

It has been argued, too, that if the opposite party should get control of the State, nothing could prevent them upon any other construction from subjecting all the advocates of this oath to like deprivations in the same way. This argument also has two aspects : the one political, the other judicial. In the broadest political statement, I suppose it would stand nearly thus: that because the patriotic and loyal portion of the body politic, when they had the power, had endeavored to purge the State of treason and disaffection, and save it from existing rebellion and future disorder; therefore, the traitorous and disloyal, when they should get the power, would straightway put all loyalty and patriotism under like disabilities. I might answer this by saying that I suppose they most probably would. In the judicial aspect, I can see also that in times of high party feeling a loyal majority might deprive a loyal minority, or certain obnoxious but innocent persons, of important civil rights and liberties, by enacting against them a legislative sentence of punishment for real or imaginary offences as criminal, but for this very prohibition, which was doubtless inserted into the Federal Constitution for the purpose of preventing such possible injustice; and to this suggestion (I must acknowledge) I have found no reliable answer but in the opinion which holds

this part of the Constitution to be in substance a bill of pains and penalties, and so far unconstitutional and void.

I am further reconciled to this conclusion by the reflection, that if it seem to admit of any questionable latitude of construction, it is a liberality on the side of the largest liberty— not by any means a licence for disloyalty, but the amplest civil freedom for all submissive and law-abiding citizens,— and establishes a precedent not for the present state of things merely, but for all future times and conditions of the country : wherein it may be said to be the especial duty of the judiciary, which sits as it were upon an eminence, remote from the storm and turmoil of political antagonisms, serenely to maintain a watchful care over those great principles of law and liberty which lie at the foundation of the republic : "*ne quid respublica detrimenti caperet.*"

The judgment will be reversed, and the defendant discharged.

WAGNER, Judge. I concur in reversing this judgment, because I feel bound to yield to the authority of the Cummings case, reported in 4 Wallace ; but I dissent from much of the reasoning contained in the above opinion, and I am requested to say that Judge Fagg agrees with me.